1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| ROBERT FARROW, | ) | Case No.: 5:13-CV-05292-LHK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING FUJITSU'S |
| | ) | MOTION TO DISMISS |
| v. | ) | |
| | ) | |
| FUJITSU AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Farrow filed this suit against his former employer, Defendant Fujitsu America, Inc. ("Fujitsu"), alleging federal and California state law claims related to age discrimination and workplace retaliation.  *See* ECF No. 1 (Compl.).  Fujitsu has moved in the alternative to dismiss under Fed. R. Civ. P. 12(b)(1) or 12(b)(6), or to compel arbitration and stay this litigation.  *See* ECF No. 10.  Farrow filed an Opposition, *see* ECF No. 17, and Fujitsu filed a Reply and objections to certain evidence, *see* ECF No. 19.  The Court finds the Motion suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b), and therefore VACATES the hearing and case management conference set for April 10, 2014.  Having considered the briefing, the record in this case, and applicable law, the Court GRANTS the Motion for the reasons stated below.

1

## I. BACKGROUND

This dispute arises from Farrow's employment with Fujitsu.  The following facts are undisputed.  Farrow applied for a job with Fujitsu by submitting an application dated June 20, 2005.  Decl. of Cora Quiroz (ECF No. 28, "Quiroz Decl. 1") ¶ 8, Ex. A.  Farrow's application included a signed acknowledgment that a condition of his employment was his "agreement to submit claims related to termination of employment, discrimination, unlawful harassment, including sexual harassment, . . . to final and binding arbitration." *Id.* Ex. A.  In a letter dated July 27, 2005, Fujitsu Computer Systems Corporation (the predecessor to Defendant Fujitsu America, Inc.) extended Farrow an employment offer to become "Director, Federal Sales," which Farrow signed on July 28, 2005 and faxed back to Fujitsu.  Quiroz Decl. 1 ¶ 9, Ex. B.  Before Farrow started his job with Fujitsu, he received a package of materials from Fujitsu, including an "Arbitration Policy and Agreement." *Id.* ¶ 10, Ex. C ("Agreement").  Farrow signed the Agreement on August 22, 2005, his first day with Fujitsu.  *Id.*  At the times he signed his application and the offer letter, Farrow lived in Maryland.  *Id.* Exs. A, B (listing Maryland addresses).

The Agreement states in part:

> If there is any dispute with Fujitsu Computer Systems Corporation (the "Company"), in any way arising out of the termination of your employment, any demotion, or arising out of any claim of discrimination, unlawful harassment including sexual harassment, or claims of breach of the covenant of good faith and fair dealing, or violations of the public policy, or as to all the preceding any related claims of defamation or infliction of emotional distress, you and the Company agree to waive their respective rights to a jury or judge trial and to instead submit all such disputes <u>exclusively</u> to final and binding arbitration pursuant to the provisions of the Federal Arbitration Act.

Agreement § 1.  The Agreement also contains provisions for selecting an arbitrator, the scope of the arbitrator's authority, and procedures for discovery and hearings.  *Id.* §§ 2-13.

During his employment with Fujitsu, Farrow sold products to a variety of customers across the country.  From approximately 2005 to 2007, Farrow handled sales to the federal government, but then sold to federal, state, and local governments from 2007 to 2011, and then also to private customers from 2011 to the end of his employment.  Opp'n at 4.  Farrow's customers were located nationwide, including Maryland and California.  *Id.*  While Farrow travelled to multiple locations

2

United States District Court
For the Northern District of California

1    during his employment—including to Fujitsu's headquarters in California—he worked at a Fujitsu

2    office in Maryland until 2009, and then from his Maryland home until his termination. *See* Quiroz

3    Decl. 1 ¶ 3; Reply at 3.

4        Fujitsu terminated Farrow on November 13, 2012. Compl. ¶ 7. In response, Farrow filed

5    this lawsuit, alleging that Fujitsu fired him because of his age (he was 65 at the time) and because

6    he reported and opposed sexual harassment and age discrimination against other employees. *See*

7    *id.* ¶¶ 26-29. Farrow pleaded claims under the Age Discrimination in Employment Act, Title VII,

8    and the California Fair Employment and Housing Act. *Id.* at 11-16.

9        On December 9, 2013, Fujitsu filed the instant motion to dismiss Farrow's complaint or

10    stay this case pending arbitration under the Agreement. ECF No. 10 ("Mot."). Farrow filed an

11    opposition on January 6, 2014 (ECF No. 17, "Opp'n"), and Fujitsu filed a reply and objections to

12    certain evidence provided by Farrow on January 17, 2014 (ECF No. 19).[1]

13    **II.**     **LEGAL STANDARDS**

14        **A.**      **The Federal Arbitration Act**

15        Fujitsu's motion to dismiss or compel arbitration turns on the existence of a valid

16    arbitration agreement between the parties that covers Farrow's claims, pursuant to the Federal

17    Arbitration Act ("FAA"). Under Section 3 of the FAA, "a party may apply to a federal court for a

18    stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing

19    for such arbitration.'" *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010) (quoting

20    9 U.S.C. § 3). If all claims in litigation are subject to a valid arbitration agreement, the court may

21    dismiss or stay the case. *See Hopkins & Carley, ALC v. Thomson Elite*, No. 10-CV-05806, 2011

22    U.S. Dist. LEXIS 38396, at *28-29 (N.D. Cal. Apr. 6, 2011).

23        The FAA states that written arbitration agreements "shall be valid, irrevocable, and

24    enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

25    9 U.S.C. § 2. In deciding whether a dispute is arbitrable, a court must answer two questions: (1)

26    whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement to

27

28    _____

[1]      Pending resolution of this Motion, the parties stipulated to stay discovery, which this Court approved on December 12, 2013. ECF No. 13.

Case No.: 5:13-CV-05292-LHK
ORDER GRANTING FUJITSU'S MOTION TO DISMISS

*United States District Court*
*For the Northern District of California*

arbitrate encompasses the claims at issue. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If a party seeking arbitration establishes these two factors, the court must compel arbitration. *Id.*; 9 U.S.C. § 4. "The standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the [FAA] is phrased in mandatory terms." *Republic of Nicar. v. Std. Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991). Nonetheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

The FAA creates a body of federal substantive law of arbitrability that requires a healthy regard for the federal policy favoring arbitration and preempts state law to the contrary. *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475-79 (1989); *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 936-37 (9th Cir. 2001). State law is not entirely displaced from the federal arbitration analysis, however. *See Ticknor*, 265 F.3d at 936-37. When deciding whether the parties agreed to arbitrate a certain matter, courts generally apply ordinary state law principles of contract interpretation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Parties may also contract to arbitrate according to state rules, so long as those rules do not offend the federal policy favoring arbitration. *Volt*, 489 U.S. at 478-79. Thus, in determining whether parties have agreed to arbitrate a dispute, the court applies "general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (quoting *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996)). "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). If a contract contains an arbitration clause, there is a presumption of arbitrability, *AT&T*, 475 U.S. at 650, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

4

**B.      Choice of Law**

As noted above, state contract law generally governs interpretation of arbitration

agreements under the FAA.  *See Mundi*, 555 F.3d at 1044; *Volt*, 489 U.S. at 476 ("[T]he federal

policy is simply to ensure the enforceability, according to their terms, of private agreements to

arbitrate.").  However, the Agreement in this case does not specify which state's law controls.  The

parties agree that federal common law should determine the choice-of-law question, according to

the principles of *Chuidian v. Philippine National Bank*, 976 F.2d 561, 564-65 (9th Cir. 1992).  *See*

*also Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997) ("Federal common law

applies to choice-of-law determinations in cases based on federal question jurisdiction.").  In

*Chuidian*, the Ninth Circuit held that the law of the state with the "most significant relationship to

the transaction and the parties" should apply, under the Restatement (Second) of Conflicts of Laws.

976 F.2d at 564.  The Restatement recites a multi-factor test:

> (1) The rights and duties of the parties with respect to an issue in contract are
> determined by the local law of the state which, with respect to that issue, has the
> most significant relationship to the transaction and the parties under the principles
> stated in § 6.[2]
> (2) In the absence of an effective choice of law by the parties (see § 187), the
> contacts to be taken into account in applying the principles of § 6 to determine the
> law applicable to an issue include:
>     (a) the place of contracting,
>     (b) the place of negotiation of the contract,
>     (c) the place of performance,
>     (d) the location of the subject matter of the contract, and
>     (e) the domicil, residence, nationality, place of incorporation and place of
>     business of the parties.
> These contacts are to be evaluated according to their relative importance with respect
> to the particular issue.

Restatement (Second) of Conflicts of Laws § 188.

---

[2]      The Restatement (Second) of Conflicts of Laws § 6 provides that, absent a "statutory
directive of its own state on choice of law," a court may consider the following non-exclusive
factors "relevant to the choice of the applicable rule of law: "(a) the needs of the interstate and
international systems, (b) the relevant policies of the forum, (c) the relevant policies of other
interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations, (e) the basic policies underlying the particular field of
law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and
application of the law to be applied."  *See also Chuidian*, 976 F.2d at 564 n.2.

III.     **DISCUSSION**

     A.     **Maryland Law Applies In This Case**

As noted above, the Agreement omits a choice-of-law provision to establish which state's law governs interpretation of the contract. *See* Agreement § 1. The parties concur that, under *Chuidian*, the Restatement's "most significant relationship" test should decide the governing law. However, the parties disagree on the outcome: Farrow insists that California law governs, while Fujitsu believes it is Maryland's. *See* Opp'n at 2-9; Reply at 2-5. The Court agrees with Fujitsu.

Application of the Restatement factors indicates that Maryland has the strongest relationship to the parties' employment relationship. The first three factors address the place of contracting, place of negotiation of the contract, and the place of performance. Here, Farrow received his employment offer in Maryland and signed both his acceptance letter and the Agreement in Maryland. *See* Restatement (Second) of Conflicts § 188 cmt. e ("the place of contracting is the place where occurred the last act necessary"). He also performed his work from a Fujitsu office in Maryland and—after 2009—from his Maryland home office. While Farrow travelled to several states for work, including California, his workplace was most consistently in Maryland.

The fourth and fifth Restatement factors address the location of the subject matter of the contract and the locations of the parties. Overall, these considerations also favor Maryland. The subject matter of the Agreement was Farrow's employment, which (as explained above) centered in Maryland. Additionally, Farrow lived and worked in Maryland when the alleged discrimination and his termination occurred. *Cf. Economu v. Borg-Warner Corp.*, 652 F. Supp. 1242, 1248 (D. Conn. 1987) (finding New York had the "most significant relationship" to an employment dispute partly because "plaintiff's original employment was negotiated in New York, [and] he maintained an office and staff there"). Farrow also filed a claim with the Equal Employment Opportunity Commission ("EEOC"), based on the same issues in this case, in Maryland. Reply at 4.

Farrow offers numerous facts that supposedly tie his employment to California, many of which relate to the fact that Fujitsu's headquarters and much of its infrastructure were located in California during Farrow's employment. *See* Opp'n at 2-9; Decl. of Robert Farrow (ECF No. 15,

6

"Farrow Decl.") ¶¶ 7-21.[3]  While Farrow's job undeniably had some connections to California, most of the facts that Farrow identifies have at best a tangential relationship to this case.  For example, Farrow points out that his job offer letter was addressed to him from California, that his last two Fujitsu supervisors lived in California, and that he listed Fujitsu's California address as his official return address on certain documents.  *See* Opp'n at 2-4.  However, none of this changes the fact that Farrow lived and worked in Maryland throughout his employment and executed the relevant documents in Maryland.  Most of the connections that Farrow enumerates are merely consistent with the fact that Fujitsu is located in California, and do not relate specifically to the subject matter of Farrow's employment or this litigation.  Indeed, the fact that the "computerized business systems plaintiff used for company business" were located in California (Opp'n at 5) are wholly irrelevant to this dispute.  Farrow cites no legal authority holding that such attenuated contacts are probative of determining the state with the most significant relationship to an employment transaction.

Farrow also argues that applying California law will promote consistency and predictability for Fujitsu employees who work in other states.  *See* Opp'n at 8-9.  Fujitsu responds that Maryland has a greater interest in applying its law to employees who live and work within its borders, and that applying Maryland law best protects the justified expectations of the parties because both Farrow and Fujitsu expected Farrow to work out of Maryland.  *See* Reply at 4 (citing Restatement (Second) of Conflict of Laws § 6).  The Court need not decide, as a general matter, which state has a more significant relationship to an employment dispute when the employer and employee are located in different states.  Under the facts presented here, the Court concludes that Maryland has the strongest connection to this dispute, and therefore applies Maryland state law for purposes of interpreting the Agreement.

### B.    Unconscionability

Farrow does not dispute that he signed the Agreement or that his claims are subject to mandatory arbitration if the Agreement is valid and enforceable.  Indeed, all of Farrow's pleaded

---

[3]    Farrow requests judicial notice of two documents showing that Fujitsu is located and incorporated in California.  ECF No. 14.  The Court grants judicial notice, but finds the documents unnecessary because Fujitsu has not disputed its location or corporate status.

1    causes of action relate to workplace discrimination, and the Agreement plainly covers "any dispute

2    . . . arising out of any claim of discrimination."  Agreement § 1.  Rather, Farrow's sole challenge to

3    the enforceability of the Agreement is the doctrine of unconscionability.  Farrow contends that the

4    Agreement is both procedurally and substantively unconscionable due to unequal negotiating

5    power between the parties and certain unfair provisions.  *See* Opp'n at 9-20.  In reply, Fujitsu

6    asserts that none of the contested provisions in the Agreement is unconscionable and requests, in

7    the alternative, that the Court sever any unconscionable provisions and preserve the remainder of

8    the Agreement.  *See* Reply at 13-14.

9           As explained above, state law governs written arbitration agreements under the FAA.  *See* 9

10   U.S.C. § 2 (stating that an arbitration agreement "shall be valid, irrevocable, and enforceable, save

11   upon such grounds as exist at law or in equity for the revocation of any contract").  "Thus,

12   generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied

13   to invalidate arbitration agreements without contravening § 2."  *Doctor's Assocs., Inc. v.*

14   *Casarotto*, 517 U.S. 681, 687 (1996).  Accordingly, if the Agreement is unconscionable under

15   Maryland law, the Agreement is unenforceable.[4]

16          The Court of Appeals of Maryland has recognized that "[a]n unconscionable bargain or

17   contract has been defined as one characterized by 'extreme unfairness,' which is made evident by

18   '(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the

19   other party.'"  *Walther v. Sovereign Bank*, 386 Md. 412, 426 (2005) (quoting Black's Law

20   Dictionary 1560 (8th ed. 2004)).  Under Maryland law, "a contract is unconscionable only if it is

21   both procedurally and substantively unconscionable."  *Mould v. NJG Food Serv.*, No. JKB-13-

22   1305, 2013 U.S. Dist. LEXIS 174125, at *8 (D. Md. Dec. 11, 2013) (applying Maryland law).

23   Accordingly, the Court addresses Farrow's claims of procedural and substantive unconscionability

24   in turn.

25

26

27   ─────────────────────
     [4]      The FAA preempts state law that "unduly burden[s] arbitration."  *Smith v. Jem Grp., Inc.*,
28   737 F.3d 636, 641 (9th Cir. 2013).  Here, neither party contends that Maryland law regarding
     unconscionability unduly burdens arbitration or is otherwise preempted by the FAA.

Case No.: 5:13-CV-05292-LHK
ORDER GRANTING FUJITSU'S MOTION TO DISMISS

### 1.    Procedural Unconscionability

Farrow believes that the Agreement was procedurally inequitable because Fujitsu was the stronger party and presented Farrow with the Agreement "on a take it or leave it basis," rendering the Agreement a contract of adhesion.  Opp'n at 10; *see also* Restatement (Second) of Conflict of Laws § 187 cmt. b (defining an adhesion contract as "one that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms").  Farrow also argues that the Agreement "was buried in a bunch of other employment hiring documents," and that he received no explanation about the arbitration provisions and no opportunities to negotiate the terms or consult a lawyer.  Opp'n at 10; Farrow Decl. ¶¶ 4-7.  Fujitsu does not dispute that the Agreement was adhesive, but contends that Farrow received sufficient notice and opportunity to review the contract.  *See* Reply at 5-7.

The Court concludes that, under Maryland law, the Agreement was not procedurally unconscionable.  On one hand, it is undisputed that Fujitsu had superior bargaining power relative to Farrow and conditioned Farrow's employment on acceptance of arbitration.  On the other hand, Farrow received notice of Fujitsu's arbitration requirement even before he submitted his employment application, and thus had at least several weeks after he applied to address any concerns with Fujitsu or seek independent advice.  Farrow's June 20, 2005 job application included his signed acknowledgment that: "I understand that a condition of my employment is my agreement to submit claims . . . to final and binding arbitration."  Quiroz Decl. 1 Ex. A.  Farrow then received his offer letter on July 27, 2005, roughly five weeks later.  The offer letter, which preceded Farrow's receipt of the Agreement itself, gave Farrow two days (until July 29, 2005) to accept the offer and required him to "agree to submit to final and binding arbitration any dispute arising out of the termination of your employment."  Quiroz Decl. 1 Ex. B.  However, the letter also told Farrow he could contact Fujitsu with any questions, and Farrow signed and returned the offer letter after only one day (on July 28, 2005).  Farrow then had until August 2, 2005 (his first work day) to raise any questions about the Agreement itself, but apparently never did so.  While Farrow claims that he asked a future supervisor about an invention policy, there is no indication that he inquired about arbitration or attempted to seek legal advice.  Farrow Decl. ¶ 4.

United States District Court
For the Northern District of California

Farrow implies that Fujitsu was affirmatively required to explain the arbitration provisions to Farrow and tell him that he could consult a lawyer.[5]  *See* Opp'n at 10.  However, the Court of Appeals of Maryland thoroughly rejected similar arguments in *Walther*.  There, the plaintiffs argued that an arbitration provision was procedurally unconscionable because the plaintiffs were not provided an opportunity to review the agreement in detail.  386 Md. at 428.  The court was not persuaded:

> The stance that this Court took in *Humphreys* in regard to the justifiably difficult hurdle that a signatory to a contract must make before a court will rescind a contract because of its unfair terms remains firm and is based on one of the most commonsensical principles in all of contract law, *i.e.*, that a party that voluntarily signs a contract agrees to be bound by the terms of that contract. In its simplest terms, petitioners argue that they should not be held to an agreement that they signed but did not take the time to read. There must exist something more before we can find the arbitration clause at issue to be unconscionable.

*Id.* at 429-30.  In response to plaintiffs' argument that the agreement was adhesive, the *Walther* court held: "A contract of adhesion is not automatically deemed per se unconscionable."  *Id.* at 430.  Thus, *Walther* largely forecloses Farrow's theory of procedural unconscionability here, and Farrow cites no contrary Maryland authority.  For these reasons, the Court concludes that, overall, the Agreement was not procedurally unconscionable.

### 2.    Substantive Unconscionability

Farrow raises a host of challenges to the substantive fairness of the Agreement, alleging that: (a) the Agreement is non-mutual; (b) the one-year limitations period is overly restrictive; (c) the discovery provisions are inadequate; and (d) Fujitsu did not execute the Agreement.  *See* Opp'n at 11.  The Court addresses each challenge in order.

**Non-mutuality:** Farrow argues that the Agreement requires arbitration of claims that are disproportionately likely to be employee claims, while permitting Fujitsu to litigate more potential claims in court.  Farrow relies primarily on *Fitz v. NCR Corp.*, where a California court ruled that an agreement that required arbitration of any employee discrimination claims but permitted litigation of employer trade secret claims was unfairly non-mutual.  118 Cal. App. 4th 702, 724-25 (2004).  Here, Farrow says that Fujitsu "is not required to arbitrate its claims against the

---

[5]     Fujitsu notes that at the time Farrow started his employment with Fujitsu, Farrow was a licensed attorney in Ohio.  *See* Mot. at 13; Reply at 6.  Farrow does not dispute this fact.

Case No.: 5:13-CV-05292-LHK
ORDER GRANTING FUJITSU'S MOTION TO DISMISS

1   employee," pointing to a clause that excludes trade secret misappropriation claims from arbitration.

2   Opp'n at 13.  However, the Agreement itself belies the breadth of Farrow's arguments.  The

3   Agreement states that "you *and the Company* agree to waive their respective rights" to litigate any

4   claims "arising out of the termination of your employment."  Agreement § 1 (emphasis added).

5   While trade secret misappropriation is excluded, so are "claims for workers' compensation,

6   unemployment insurance or any wage and hour matter"—claims filed mostly or exclusively by

7   employees.  *Id.*  Therefore, employees might have broader recourse to court than the employer does

8   under the Agreement.  Moreover, Maryland law does not require complete mutuality in arbitration

9   agreements.  *See Walther*, 386 Md. at 433 ("Mutuality, however, does not require an exactly even

10  exchange of identical rights and obligations between the two contracting parties before a contract

11  will be deemed valid."); *Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 259 (D. Md. 2011)

12  (applying Maryland law; "However, arbitration agreements that more frequently bind the employee

13  than the employer are valid despite the differences in the parties' rights.").  For these reasons, the

14  Court concludes that the Agreement is sufficiently bilateral with respect to the scope of arbitrable

15  claims to be enforceable in this regard.

16          **Limitations period:** The Agreement imposes a one-year limitation for requesting

17  arbitration.  Agreement § 2.  Farrow argues that this restriction is unconscionable because his

18  discrimination claims in this lawsuit "effectively" have longer limitations periods due to optional

19  EEOC investigations that might last longer than one year.  Opp'n at 14.  However, Farrow fails to

20  show that any limitations periods that apply to his causes of action are substantially longer than the

21  period to which he consented by executing the Agreement, or that it would be otherwise unfair to

22  require Farrow to initiate arbitration of his claims within one year.  Furthermore, the Fourth Circuit

23  has held that generally, "statutory limitations periods may be shortened by agreement, so long as

24  the limitations period is not unreasonably short," and specifically, that an arbitration agreement that

25  reduced the limitations period for antitrust claims from four years to one year was not

26  unreasonable.  *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 287-88 (4th Cir. 2007); *see also*

27  *Dieng v. College Park Hyundai*, No. DKC 2009-0068, 2009 U.S. Dist. LEXIS 58785, at *19-20

28  (D. Md. July 9, 2009) (applying *In re Cotton Yarn* in approving a "60/180 day limitations period"

11

1    despite "otherwise applicable two and three year statutory limitation periods").  The Fourth

2    Circuit's guidance is persuasive here.  While somewhat restrictive, the one-year limitation does not

3    appear so unreasonable as to warrant voiding this provision or the Agreement as a whole.

4            **Discovery:** The Agreement permits discovery to the extent "provided in applicable

5    statutory law," but with the restriction that "depositions for discovery shall not be taken unless

6    leave to do so is first granted by the Arbitrator."  Agreement § 6.B.  Farrow's sole complaint

7    regarding available discovery is that the Agreement supplies no express guidelines for when an

8    arbitrator should allow depositions.  *See* Opp'n at 15-16.  In response, Fujitsu claims the

9    Agreement allows "unlimited discovery" and is "no more restrictive than in court," and suggests

10   that the Agreement is *more* permissive than the Federal Rules of Civil Procedure.  Reply at 10.

11   Fujitsu grossly exaggerates the Agreement's scope.  However, the Court is not convinced that

12   making depositions discretionary renders the discovery provisions or the Agreement

13   unconscionable.  Farrow's cited authorities (none applying Maryland law) are distinguishable.  For

14   example, *Fitz* disapproved of a two-deposition limit, but in combination with further restrictions

15   that no document production was allowed and any additional discovery required showing that a fair

16   hearing would be "impossible."  118 Cal. App. 4th at 716-18.  Similarly, Farrow relies on *Hulett v.*

17   *Capitol Auto Group, Inc.*, No. 07-6151-AA, 2007 U.S. Dist. LEXIS 81380 (D. Or. Oct. 29, 2007),

18   but that court rejected limits on written discovery partly because they were at the discretion of the

19   opposing party (not just an arbitrator), and ultimately upheld the arbitration agreement after

20   severing the discovery limitation.  Additionally, the Agreement permits use of depositions and live

21   witnesses at the arbitration hearing, indicating that the parties should have access to necessary

22   testimony.  Agreement § 8.  Farrow has not adequately demonstrated that the Agreement's

23   discovery provisions are substantively unconscionable under Maryland law.

24           **Signatures:** Farrow contends that the Agreement applies unilaterally to Farrow—and not

25   Fujitsu—because the Agreement does not bear a signature (or signature line) for Fujitsu.  Opp'n at

26   18.  This argument is unpersuasive.  As noted above, the Agreement states expressly that it applies

27   to both parties and that Fujitsu also waived the right to litigate certain claims in court.  Fujitsu does

28   not argue in its Motion that the Agreement applies only to Farrow.  Therefore, this is not a case

12

"where the agreement specifically allows the employer to ignore the results of arbitration." *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 275 (4th Cir. 1999) (rejecting employee's argument that arbitration agreement was non-mutual).   Finally, Farrow admits that he signed the Agreement but insinuates that the Agreement is ineffective because his signature page had "no words indicating he was agreeing to the arbitration agreement." Opp'n at 18; Farrow Decl. ¶ 3.  This argument is, at best, disingenuous.

Apart from the Agreement provisions that Farrow challenges, other clauses support the conclusion that the Agreement is not substantively unconscionable. *See* Mot. at 15-16.  Other courts have indicated that restrictions on remedies or judicial review can render an arbitration agreement unconscionable. *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 103-07 (2000) (rejecting damages limitation in arbitration agreement and discussing need for judicially reviewable findings).  Here, the Agreement does not restrict remedies that would otherwise be available in court, permitting the arbitrator to award "remedies in law or equity which are requested by the parties and which he/she determines to be legally supported by credible, relevant evidence."  Agreement § 10.E.  The Agreement also requires a "written opinion and award" and allows for judicial review under the FAA.  *Id.* §§ 10.A, 12.  These terms provide additional indicia of fairness in the arbitration proceedings.

Because Farrow has not demonstrated that the Agreement was procedurally unconscionable, or that any of the challenged provisions is substantively unconscionable, the Agreement remains enforceable, and all of Farrow's claims are subject to arbitration.

## C.    Stay vs. Dismissal

Because the Court determines that all of Farrow's claims are subject to arbitration, Fujitsu's motion to compel arbitration should be granted.  When arbitration is mandatory, courts have discretion to stay the case under 9 U.S.C. § 3 or dismiss the litigation entirely. *See Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir. 1988); *see also Hopkins & Carley*, 2011 U.S. Dist. LEXIS 38396, at *28 ("Where an arbitration clause is broad enough to cover all of a plaintiff's claims, the court may compel arbitration and dismiss the action.").  Fujitsu has requested either dismissal of Farrow's claims or an order compelling arbitration and staying the litigation, but

13

United States District Court
For the Northern District of California

the parties provide no guidance as to which option is more appropriate here.  This Court has previously stayed litigation pending arbitration—instead of dismissing—by agreement of the parties in light of potential concerns about statutes of limitation.  *See id.* at *28-29.  Because the parties have identified no such concerns here, and dismissal would render this decision immediately appealable (*see MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 7 (9th Cir. 2014) ("[A]n order compelling arbitration may be appealed if the district court dismisses all the underlying claims, but may not be appealed if the court stays the action pending arbitration.")), the Court concludes that dismissal is appropriate.

**IV.     CONCLUSION**

    For the foregoing reasons, the Court GRANTS Fujitsu's motion to dismiss all of Farrow's claims.  The Clerk shall close the case file.

**IT IS SO ORDERED.**

Dated: April 10, 2014

_____
LUCY H. KOH
United States District Judge